J-S55025-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARCEL RENNIER MASON | : | |
| | : | |
| Appellant | : | No. 861 WDA 2019 |

Appeal from the Judgment of Sentence Entered June 4, 2019
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0000139-2018

BEFORE: BOWES, J., McCAFFERY, J., and COLINS, J.[*]

CONCURRING AND DISSENTING MEMORANDUM BY BOWES, J.:

**FILED: JUNE 4, 2021**

I respectfully dissent from that portion of the Majority's holding that treats the General Assembly's 1996 amendment of 18 Pa.C.S. § 5105(a)(5) as a mere stylistic revision. By substituting the verb "provides" for "volunteers," I believe that our legislature plainly intended to expand the scope of this criminal statute. Furthermore, the evidence adduced was sufficient to prove that Appellant provided false statements to police with the intent to hinder apprehension. Accordingly, I would affirm Appellant's conviction of hindering apprehension under the statute as amended.

_____

[*] Retired Senior Judge assigned to the Superior Court.

As the Majority correctly notes, Appellant was found guilty of this offense at a bench trial based upon false statements he provided in response to police questioning about the whereabouts of his cousin Rahmael Holt. At the time that Appellant made these statements, Holt was implicated in the shooting death of a New Kensington police officer, Brian Shaw, during a traffic stop.

The distinguished Majority reverses that conviction by finding that our legislature's 1996 amendment to § 5105(a)(5), which changed the definition of the offense from "volunteers false statements to police" to "provides false statements to police" neither broadened its meaning nor extended its ambit. *See* Majority Memorandum, at 12. Additionally, my colleagues read into the statute a new requirement that some type of "causal connection" must exist between the false information provided and actual hindering that they conclude was not met herein. Finally, the Majority concludes that the evidence was insufficient to demonstrate that Appellant's statement was false, *i.e.*, that he did know Holt's whereabouts.

I respectfully disagree with the Majority's interpretation of the present version of § 5105(a)(5). While the Majority correctly recites the relevant principles of statutory construction, I submit that it fails to give the words of the statute their plain and ordinary meaning. In ***Commonwealth v. Gettemy***, 591 A.2d 320, 323 (Pa.Super. 1991), this Court held that the word "volunteers" in the prior iteration of Pennsylvania's hindering apprehension statute excluded situations where one gave false and misleading answers in

response to police inquiries. We reasoned that such communication was not "volunteering" within the meaning of the statute and concluded that the prior version of § 5105(a)(5) was intended to reach those defendants who took the initiative in actively misleading law enforcement and sending them down the wrong trail purposefully. In arriving at that interpretation, we relied heavily on the comments to the Model Penal Code ("MPC") upon which the statute had been modeled.

Within two years of our decision in *Gettemy*, a spate of House and Senate bills were introduced proposing a change in the "volunteers" language to "provides," culminating in the amendment of the statute in 1996. In pertinent part, 18 Pa.C.S. § 5105 now states as follows:

(a) Offense defined. - A person commits an offense if, with intent to hinder the apprehension, prosecution, conviction or punishment of another for crime or violation of the terms of probation, parole, intermediate punishment or Accelerated Rehabilitative Disposition, he:

* * *

(5) **provides** false information to a law enforcement officer.

18 Pa.C.S. § 5105(a) (as amended 1996, Dec. 18, P.L. 1074, No. 160, §1, effective in 60 days) (emphasis added).

Despite the legislature's change in the statutory language, however, the Majority applies this Court's pre-amendment holding in *Gettemy* and relies upon the aforementioned comments to the MPC construing the word "volunteers" to discern the appropriate definition of the word "provides" in the

- 3 -

amended version of § 5105(a)(5). The Majority finds that the "[t]he two terms, in application, are similar." Majority Memorandum at 10. It concludes that when Appellant stated he had no knowledge of his cousin's whereabouts in response to police questioning, he did not "provide" false statements within the meaning of the statute as amended. I must disagree.

Unfortunately, there is no legislative history from which we may glean the legislature's intent in changing the statutory language. Despite that void, however, I believe we can infer from the fact that the General Assembly deleted the word "volunteers" within a few years of our holding in **Gettemy** and replaced it with the word "provide" that the legislature sought to change the legal effect and application of this statutory subsection. Indeed, there was no need to amend the statute if the legislature merely intended to preserve the same statutory meaning and function. As our Supreme Court observed in **Commonwealth v. Lynn**, 114 A.3d 796, 822 (Pa. 2015), "[a] change in the language of a statute ordinarily indicates a change in legislative intent." Otherwise, "the new language of the amendment would be rendered superfluous if it has the same meaning as the pre-amended statute." **Id**.

I submit that the General Assembly meant to expand the reach of § 5105(a)(5) to encompass situations where, as here, a defendant provides false statements in direct response to police questioning. The common and ordinary meaning of the word "provides" does not include the notion that one necessarily freely initiated the act of making a false statement, nor does it

exclude false statements made in response to questioning. Furthermore, the term "provides," unlike "volunteers," has no suggestion of a lack of compulsion. The Merriam-Webster dictionary definition of "provides," when used as a transitive verb, is "to supply or make available" or "to make something available to." *See* "Provide," Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/provide. Accessed 21 May, 2021. By contrast, the Merriam-Webster dictionary definition of "volunteer" encompasses something undertaken or expressed "voluntarily" or "willingly." *See* "Volunteer," Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/volunteer. Accessed 27 May, 2021.

In my view, one who makes false statements in response to a police inquiry "provides" false statements within the customary and ordinary meaning of that word, and the legislature's amendment of the statutory language was calculated to place such statements within the ambit of this criminal statute. Accordingly, Appellant's statements in response to police inquiries properly subjected him to criminal liability if they were false and made with the intent to hinder Holt's apprehension.

To my mind, the evidence of record supports the factfinder's affirmative answers to those provisos. Allegheny County Deputy Sheriff Jared Kulik testified that their investigation revealed that Holt was related to Appellant and that Holt might be with him. N.T. Trial, 2/14/19, at 16. There was an

outstanding warrant for Appellant's arrest, and detectives and FBI agents went to Appellant's home at 833 Hinnerman Street in Duquesne, Pennsylvania to execute it. Asya Benson permitted the officers access to the home. Appellant, who is paralyzed, was in the living room lying on a bed. *Id*. The officers advised Appellant about the arrest warrant and took him into custody. The officers also conducted a protective sweep of the house looking for Holt, who was not found on the premises. *Id*. at 18.

After securing Appellant in a van that could accommodate his wheelchair, Deputy Kulik asked him "if he had seen Mr. Holt, had contact with Mr. Holt or knew where Mr. Holt was." *Id*. at 19. Appellant responded that he had not seen Holt, did not know where he was, and did not have any contact with him. *Id*. However, the ensuing search of Appellant's home yielded evidence that Holt had been there. Specifically, in the pocket of jeans found in a laundry basket, police found an identification card and a Rivers Casino member card in Holt's name. N.T., 2/14/19, at 28. Evidence obtained from a TracFone found next to Appellant's bed and from a separate TracFone retrieved from the residence at 5005 Ladora Way where Holt was ultimately arrested indicated that Holt and Appellant were, in fact, communicating with each other. Additionally, Appellant's brother was with Holt at the Ladora Way residence when Holt was arrested.

Detective Roy Dupilka interviewed Appellant following Holt's arrest. Appellant told a story that directly contradicted his earlier statements to

Deputy Kulik. He stated that Holt came to his Hinnerman Street residence in the morning hours of November 18, 2017. *See* N.T. Trial, 3/7/19, at 9. Asya Benson invited him in and Holt remained in the residence for the day. Thereafter, Appellant told the detective that he received a phone call in the late evening of November 18, 2017, advising him to check the website of a Pittsburgh-area television station for information regarding Holt being wanted for the murder of Patrolman Shaw. *Id*. at 10. According to Appellant, he told Holt and Asya that Holt could no longer stay there, and "As[y]a Benson drove Holt to another residence." *Id*.

The question for the factfinder was whether Appellant provided a false statement to Deputy Kulik when he said that he did not know the whereabouts of Holt, and if so, whether he did so with the intent to hinder Holt's apprehension.[1] My colleagues alternatively find that there was insufficient evidence that Appellant provided a false statement when told police that he did not know Holt's whereabouts. I believe that conclusion stems from an improper application of our standard of review.

_____

[1] The Majority notes that Holt was arrested just hours after Appellant made the false statements to police. Hence, it suggests that Appellant's conviction is infirm because any false statements on his part did not actually impair the ability of the police to apprehend Holt. Such reasoning, in my view, ignores the language of the statute. Criminal liability under the former and present versions of the statutory provision at issue only requires an **intent** to hinder apprehension, not proof of actual hindrance. *See* 18 Pa.C.S. § 5105(a)(5).

It is beyond cavil that Appellant's statement to Detective Dupilka contradicted his earlier statements to Deputy Kulik when he falsely claimed that he had not seen, or had any contact with, Holt. I submit that one could reasonably infer Appellant's knowledge of Holt's whereabouts from his statement to Detective Dupilka that Asya drove Holt "to another residence," the fact that Appellant's brother was with Holt at that residence, and that Appellant and Holt were in communication at the time via text. This evidence, together with the reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner, was sufficient to support the trial court's finding that Appellant falsely told police he did not know Holt's whereabouts, and that he did so with the intent to hinder Holt's apprehension.

For the foregoing reasons, I respectfully dissent from that portion of the Majority's memorandum reversing the hindering apprehension conviction and vacating its corresponding judgment of sentence. I concur with the Majority's affirmance of Appellant's judgment of sentence on the conspiracy conviction.